**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **DAVID GEVAS (B-41175),** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No.  23 C 50383** |
| | ) | |
| **ARTHUR MANZANO,** *et al.*, | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

As reported in local and national media, illicit drugs find their way into Illinois jails and prisons, often embedded in letters and cards sent to prisoners in the mail.[1]  Use of these drugs by inmates creates health risks not only for the inmates who use them, but also for inmates who are exposed to the smoke.  In this lawsuit under 42 U.S.C. § 1983, Illinois prisoner David Gevas contends that he was exposed to unsafe amounts of secondhand K2 smoke at the Dixon Correctional Center from March 2023 to December 2023.  Mr. Gevas believes prison officials deliberately exposed him to this hazard by way of cell assignments and retaliated against him for his complaints by intentionally withholding his own mail.  Gevas identified Defendants Lieutenant Arthur Manzano and Placement Officer Samantha Rodriguez as the individuals responsible for the alleged misconduct.  Both officers have denied the allegations and move for summary judgment.  As explained below, the motion [124] is granted with respect to Defendant Manzano but denied as to Defendant Rodriguez.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "'there is no genuine dispute as to any material fact' and the moving party 'is entitled to judgment as a matter of law.'" *Johnson v. Edwards*, 164 F.4th 1074, 1079 (7th Cir. 2026) (quoting FED. R. CIV. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477

---

[1]    *See*, *e.g.*, Azam Ahmed & Matt Richtel, *No Pills or Needles, Just Paper: How Deadly Drugs Are Changing*, N.Y. TIMES, https://www.nytimes.com/2026/03/21/world/deadly-drugs-paper.html (last visited April 13, 2026).

U.S. 317, 322–23 (1986). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 249 (cleaned up).

This court's Local Rule 56.1 establishes procedures that "serve to streamline the resolution of summary judgment motions by having the parties identify undisputed material facts and cite the supporting evidence." *Laborers' Pension Fund v. Innovation Landscape, Inc.*, No. 15 CV 9580, 2019 WL 6699190, at *1 (N.D. Ill. Dec. 9, 2019) (citation omitted). Speculation "cannot create a genuine issue of fact that defeats summary judgment" and "is insufficient to defeat a summary judgment motion." *Flowers v. Kia Motors Fin*., 105 F.4th 939, 946 (7th Cir. 2024) (citing *Circle City Broad. I, LLC v. AT&T Servs., Inc.*, 99 F.4th 378, 384 (7th Cir. 2024) and *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014)).

The court considers relevant, adequately supported facts identified in the parties' L.R. 56.1 statements. *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019) ("[I]t is not the duty of the district court to scour the record in search of material factual disputes" (citations and internal quotation marks omitted)). The court also will consider facts asserted in Gevas's response to Defendants' L.R. 56.1(a)(2) statement of facts so long as he could testify to the facts and so long as the facts are "fairly responsive" to Defendants' asserted facts. *See* L.R. 56.1(e)(2). But the court limits its consideration to the fifty additional statements of fact that Gevas was granted leave to submit. (*See* Minute Order of November 26, 2025 [138] (denying Gevas's request to submit 96 additional facts as excessive).) *See also* L.R. 56.1(d)(5) (setting limit of 40 additional facts absent leave of court).

2

## BACKGROUND

The facts summarized below are taken from the parties' respective Local Rule 56.1 statements.[2]  Illinois prisoner David Gevas has been incarcerated at the Dixon Correctional Center since April 2019.  (DSOF [125] ¶ 1.)  Gevas has been diagnosed with sleep apnea, which causes him to stop breathing at times while he sleeps, so he uses a medically prescribed device known as a CPAP machine at night to improve his ability to breathe.  (PSOF [148] ¶¶ 2, 3.)  The CPAP machine is equipped with a filter.  (DSOF [125] ¶ 67.)  But, according to Gevas, the filter does not remove secondhand smoke, including the K2 smoke that is the subject of this lawsuit, from the air he breathes through the machine.  (Pl. Resp. [149] ¶ 67; PSOF [148] ¶ 4.)  If it did, he says, he "would wear the damn CPAP mask 24/7."  (Gevas Dep. [125-2] at 114:17-19.)

K2 is an illicit synthetic cannabinoid that is stained or sprayed onto paper and then smoked by prisoners who manage to get access to it.  (DSOF [125] ¶ 5.)  K2 is contraband under IDOC policy, and is subject to IDOC's zero-tolerance policy against the introduction and possession of "contraband and illicit substances, materials, and drug paraphernalia."  (*Id.* ¶ 75.)  To control the problem of K2 ingestion, IDOC staff perform routine, targeted searches.  (*Id.* ¶¶ 77, 81, 82, 84.)  Prisoners found to be in possession of K2 are disciplined and, in some instances, referred for prosecution.  (*Id.* ¶¶ 78–80.)  In addition, in October 2023, Dixon adopted a new mail scanning policy to combat the flow of illicit substances, including K2, into the facility.  (*Id.* ¶ 83.)

Named as Defendants in this lawsuit are Lieutenant Arthur Manzano and former Placement Officer Samantha Rodriguez.[3]  Defendant Manzano was an internal affairs officer at

---

[2]     Defendants' Local Rule 56.1 Statement of Material Facts is cited here as "DSOF [125] ¶ ___."  Plaintiff's Response to Defendant's Local Rule 56.1 Statement is cited here as "Pl. Resp. [149] ¶ ___." Plaintiff has also submitted an Additional Statement of Facts, cited here as "PSOF [148] ¶ ___." Defendants' Response to Plaintiff's Additional Statement of Facts is cited here as "Def. Resp. [161] ¶ ___."

[3]     Nearly two years after initiating this action, Gevas requested leave to add Governor

3

Dixon from August 2018 to May 2023, before he was promoted to Assistant Warden of Operations. (*Id.* ¶ 2.) As an internal affairs officer, Manzano conducted investigations and issued disciplinary tickets to prisoners who violated Dixon's policies concerning the possession and use of contraband, including K2 or synthetic cannabinoids. (*Id.* ¶ 70.)

Rodriguez was a correctional officer assigned to the placement office at Dixon from January 2023 to December 2023. (*Id.* ¶ 3.) Her duties in this role are not clearly described, but a declaration accompanying Defendants' LR 56.1 statement suggests that she was tasked with making decisions with respect to Gevas's cell assignments. (Rodriguez Decl. [125-11] ¶ 4.) Rodriguez was not involved in investigations concerning contraband or other illicit substances, including K2, and had no knowledge of the outcomes of those investigations. (DSOF [125] ¶¶ 71, 73.) Rodriguez asserts that she did not know which prisoners consumed K2, which prisoners were under investigation related to K2, or which prisoners had been disciplined for possession or use of K2. (*Id.* ¶ 74.) She claims, further, that she did not know what K2 was prior to this litigation. (*Id.* ¶ 72.)

Before the events giving rise to this lawsuit, Gevas was housed in Unit 112, where he "detected" no secondhand K2 smoke. (Pl. Resp. [149] ¶ 9.) Unit 112, however, was closed in March 2023—according to Defendants, for security reasons. (DSOF [125] ¶ 11.) Gevas then was assigned to 15 different cells in 5 different housing units during the following nine months (from March 22, 2023, to January 4, 2024)[4] where, he says, he was exposed to secondhand K2 smoke in large enough quantities to cause him to experience "contact highs" and other adverse

---

Pritzker and Warden Tack as defendants to this action and to expand the scope of the action to include claims about K2 smoke at Dixon in general [61]. The court denied the motion [62].

[4] The operative complaint concerns Gevas's cell assignments for a period from March 2023 to December 13, 2023. (*See* Compl. [8].) For the sake of completeness, the court has included his cell assignments through the end of December 2023, which extended into January 2024.

effects. (*See id.* ¶ 8; Pl. Resp. [149] ¶ 8.) His various housing placements, and resulting K2 exposure, are described in the paragraphs below.

**Housing Unit 27:** Between March 22, 2023, and April 13, 2023, Gevas resided in three different cells in Unit 27. (DSOF [125] ¶ 12.) He did not have a cellmate during that period, but was nevertheless exposed to secondhand K2 smoke in Unit 27. (*Id.* ¶¶ 13, 14.) Though he did not observe prisoners smoking K2 in that unit, Gevas smelled smoke from its use. (*Id.* ¶¶ 14, 16; Pl. Resp. [149] ¶¶ 14, 16.) IDOC officials assert that "K2 does not have a readily identifiable smell associated with [its] combustion" (*id.* ¶ 15), but Gevas challenges this assertion. According to him, K2 smoke (or the smoke from a similar substance that he characterizes as "Insect Poison paper") has a "distinct, identifiable odor that is a rank chemical smell." (Pl. Resp. [149] ¶ 15.)

On April 9, 2023, Gevas submitted a grievance in which he explained that he uses a CPAP machine and that he believed the housing assignment was unsafe due to his health conditions. (*Id.* ¶ 18.) He reported in his grievance that Unit 27 "is inundated with K2 smoke" and that he gets a "contact high" from breathing in the secondhand smoke. (Ex. 15 to DSOF [125-15] at 1–4.) Gevas suspected that secondhand smoke was in the ventilation system and reported that the smoke is "forced into [his] lungs through [his] CPAP" machine. (*Id.*) He also reported that he had a lesion on his right lung. (*Id.*) He asked to be moved to a housing unit "that is safe for CPAP use." (*Id.*)

In an April 12, 2023 response, the grievance officer denoted the grievance an emergency, and noted that Gevas had requested "to be moved to a cell that is safe for C-PAP use [] because the K2 smoke is affecting his breathing." (*Id.*) The response reflects Defendant Manzano's observation that "[t]he K2 smoke is being addressed in every unit. At this time, we will be moving Gevas to another cell in an attempt to assist him." (*Id.*; *see also* DSOF [125] ¶ 21.) But in Gevas's

opinion, the cell move did not solve the K2 smoke problem, as K2 smoke permeated the housing unit. (*See* Ex. 15 to DSOF [125-15] at 1–4.)

On April 10, 2023—in other words, between the time he submitted his grievance and the time he received a response to the grievance—Gevas medical staff issued a "no stairs permit" for Gevas, after he reported having difficulty walking long distances and navigating stairs. (DSOF [125] ¶ 19.)

**Housing Unit 29**: On April 18, 2023, Gevas was moved to Unit 29 to accommodate his no-stairs permit. (*Id.* ¶ 23.) He resided in Unit 29, cell 73 without a cellmate until May 18, 2023. (*Id.* ¶ 24.) As in Unit 27, Gevas contends that he was exposed to secondhand K2 smoke in Unit 29 because he saw inmates smoking the substance and he could smell it. (*Id.* ¶ 25.)

On May 10, 2023, Gevas submitted a grievance about K2 smoke in Unit 29. (*Id.* ¶ 27 (citing Ex. 15 to DSOF [125-15] at 5–9).) He asserted that Unit 29 "is inundated with K2 smoke"; indeed, Gevas said he had heard two correctional officers—Reyes and Urgmeyer—complain about smoke in the unit. (Ex. 15 to DSOF [125-15] at 8.) Gevas also reported that the power had gone out in his cell two days in a row because prisoners had "popped" the socket to smoke K2; the court presumes he means that prisoners used the sockets as a way of igniting the paper they were smoking. (*Id.*) Gevas expressed his concern that he could suffocate if the power went out while he was using his CPAP machine. (*Id.* at 9.) He again reported experiencing a "contact high" from exposure to K2 smoke in Unit 29 and fearing violence from prisoners who were smoking K2. (*Id.*) Gevas asked to be assigned to a housing unit "that is safe from K2 second hand smoke" in general, and "compatable [sic] for CPAP use." (*Id.* at 8.)

**Housing Unit 27**: On May 18, 2023, Gevas was returned to Unit 27 and assigned to cell 73. (DSOF [125] ¶ 28.) He did not have a cellmate and remained in cell 73 until September 14, 2023. (*Id.*) During that time, Gevas did not "directly observe" a prisoner smoking K2, but he saw

smoke coming from the cells of other inmates.  (*Id.* ¶ 29.)  Gevas reported that K2 was being smoked in the unit, but declined to identify the individuals who were smoking the substance for fear of being labeled a snitch.  (*Id.* ¶ 30 (citing Gevas Dep. [125-2] at 89:17–90:9).)

**Housing Unit 36:**  On September 14, 2023, Gevas was moved to Unit 36, where he was assigned to cell 22 and housed there with a cellmate who, according to Gevas, smokes K2.  (*Id.* ¶¶ 31, 32.)  On September 21, 2023, Gevas wrote a letter to Defendant Rodriguez in which he asked that she assign him to a new cell.  (*Id.* ¶ 33.)  He explained: "You have placed me into cell HU36-22 with a known K2 smoker, and he smokes K2 day and night.  Even when I am using my c-pap.  I am awaken [sic] by my heart racing, and contact highs.  Also, he has delusional episodes that wake me up.  I am in fear for my life.  Please move me to another cell."  (Individual in Custody Request [125-13] at 2.)  Rodriguez responded the next day, advising that Gevas had been put on a wait list because "there are no available low bunk cells at this time."  (*Id.* at 1.)

Gevas got into a fight with his cellmate on September 23, 2023.  (*See id.* ¶ 35 (citing Disciplinary Tickets [125-9] at 17–25).)  An investigation followed and, as reflected in a disciplinary notice, a source informed the investigator that Gevas had called his cellmate into the cell "over a disagreement they had over smoking inside of the cell."  (Disciplinary Tickets [125-9] at 21.)  On September 28, 2023, Gevas was taken to an outside hospital for treatment of his injuries.  (*Id.* at 19.)  Gevas received a disciplinary ticket for the fight.  (DSOF [125] ¶ 35.)

**Restrictive Housing**:  Upon his return to Dixon from the hospital, Gevas was placed in Restrictive Housing.  (*Id.* ¶ 36.)  He did not have a cellmate, and he remained assigned to the unit until October 16, 2023.  (*Id.* ¶ 37.)  Gevas did not "directly observe" any prisoners smoking K2 while he was in Restrictive Housing.  (*Id.* ¶ 38.)

**Housing Unit 29:**  Then on October 16, 2023, Gevas was placed in Unit 29 for a second time, where he was assigned to cell 54 with, according to Gevas, "a known K2 Insect Poison

7

paper smoker." (*Id.* ¶ 37; Pl. Resp. [149] ¶ 37.) Six days later, on October 22, 2023, Gevas submitted a grievance alleging that Defendant Rodriguez "intentionally and out of retaliation" assigned Gevas to Housing Unit 36, cell 22 and to Housing Unit 29, cell 54. (*See* DSOF [125] ¶ 39 (citing Ex. 15 to DSOF [125-15] at 14, 16).) Gevas alleged in the grievance that his previous cellmate (Unit 36, cell 22) was "a known Security Threat Group individual, and a known K2 smoker" and that his current cellmate (Unit 29, cell 54) was "a known K2 smoker and known fighter." (Ex. 15 to DSOF [125-15] at 15, 16.) He explained that he fought with his prior cellmate about K2 smoke and that his current cellmate smoked K2 in the cell and has "episodes of delusions." (*Id.*) Gevas requested "proper housing for CPAP use and proper living without K2 smoke adversely effecting my daily and nightly activities, and health." (*Id.* at 15 (cleaned up).) Prison officials deemed the grievance an emergency, and a notation on the grievance suggests that it was forwarded to "Placement" on "10/25." (*Id.*) Also on October 22, 2023, Gevas declared a hunger strike "to remove himself from" the prisoner with whom he was celled. (DSOF [125] ¶ 41; Pl. Resp. [149] ¶ 41.)

**Housing Unit 31**: Evidently in response to the emergency grievance, Gevas was moved to Unit 31, cell 17 on October 22, 2023, where he remained for five days. (DSOF [125] ¶¶ 41, 42; *see also* Pl. Resp. [149] ¶ 41.) Three days into this time, he submitted a grievance declaring "all individuals in custody that smoke K2 as my enemies" and requesting "adequate housing for CPAP and without second hand K2 smoke[.]" (Ex. 15 to DSOF [125-15] at 12.) Gevas stated his belief that Defendants Manzano and Rodriguez intentionally assigned him to cells with known K2 smokers in retaliation for his previous grievances about K2 exposure. (*Id.* at 12–13.) Prison officials again deemed the grievance an emergency, and forwarded it to "Placement" on "10/31." (*Id.* at 12.)

8

**Restrictive Housing:**  By October 27, 2023, Gevas had ended his hunger strike and was to be moved from Unit 31 and back to Unit 29.  (*See* [125-9] at 11–16.)  As Gevas stated in response to a disciplinary notice, Defendant Rodriguez had reassigned him to the same cell, with the same cellmate, as he had been assigned when he began his hunger strike.  (*Id.* at 11, 13.)  Gevas refused the assignment.  (DSOF [125] ¶ 44 (citing Ex. 9 to DSOF [125-9] at 11–16).)  He was issued a disciplinary ticket and sent to Restrictive Housing Unit, cell 40, where he resided until November 3, 2023.  (*Id.* ¶¶ 44–45).

On October 29, 2023, Gevas submitted a grievance, again requesting accommodation for his use of a CPAP machine.  (DSOF [125] ¶ 48.)  In response, Grievance Officer Carlson advised that "ADA Disability Accommodation" was denied because "[a]t this time CPAP users do not require any special needs."  (Ex. 15 to DSOF [125-15] at 21.)  Officer Carlson noted that Defendant Rodriguez advised that "Low Bunks may restrict possible movement" and that "she is not aware of who does and who does not use unauthorized substances."  (*Id.*)

Gevas also was advised that his "cells are ventilated appropriately and [that his] cells have windows that should be opened to ensure the air is cleared of any potential narcotic irritant."  (Ex. 15 to DSOF [125-15] at 18.)  But Gevas disputes that the windows were operational or that the ventilation system adequately removed secondhand K2 smoke from living units.  (PSOF [148] ¶¶ 26, 27.)

**Housing Unit 31:**  On November 3, 2023, Gevas was returned to Unit 31 and housed in cell 5 with a prisoner that, he says, smoked K2 inside the cell even when Gevas was using his CPAP machine.  (DSOF [125] ¶¶ 49–51; Pl. Resp. [149] ¶¶ 49–50.)  Five days later, he refused to return to his cell and received a disciplinary ticket for disobeying a direct order.  (DSOF [125] ¶ 52 (citing [125-9] at 5–9).)  Gevas also submitted a grievance in which he asserted that Defendant

Rodriguez had again assigned him to a cell with a known K2 smoker in retaliation for his grievances about K2 smoke. (DSOF [125] ¶ 51 (citing Ex. 15 to DSOF [125-15] at 22–26).)

**Restrictive Housing:** After refusing to return to his cell in Unit 31, Gevas was moved to Restrictive Housing, cell 39, where he remained from November 8, 2023, to December 13, 2023. (*Id.* ¶ 53.) He filed grievances on November 10, 2023, and again on November 20, 2023, concerning K2 smoke in the housing units to which he had been assigned and requested protective custody. (*Id.* ¶ 54.) Gevas was released from restrictive housing on November 22, 2023, but refused his new cell assignment. (*Id.* ¶ 56.) Gevas was again disciplined and, it appears, remained in restrictive housing for a few weeks.

**Housing Unit 31:** On December 13, 2023, Gevas was moved to Unit 31, cell 31, where he resided until December 26, 2023. (*Id.* ¶ 57.) Gevas contends that the assignment to cell 31 was another instance of intentional retaliation, as he shared that cell with two known K2 smokers. (Pl. Resp. [149] ¶ 57.) On December 26, 2023, he was moved to Unit 31, cell 17. (*See* DSOF [125] ¶ 57; Pl. Resp. [149] ¶ 57.) Two days later, on December 28, 2023, he was moved to Unit 31, cell 34, where he resided until January 8, 2024. (DSOF [125] ¶ 57.)

Gevas contends that he experiences "contact highs, heart racing, heart palpitations, anxiety, panic, agitation, headaches, fear, inability to sleep, . . . nausea, . . . shortness of breath," and depression when he "breathes in" secondhand K2 smoke or when it is "forced into his lungs by" his CPAP machine. (PSOF [148] ¶ 24.) He asserts, further, that secondhand K2 smoke in his housing units prevented him from using his CPAP machine properly. (*Id.*) In addition, Gevas notes that Correctional Officer Reyes testified in a deposition that he had "seen other staff members get woozy or lightheaded during the process of being around" secondhand K2 smoke or touching K2 paper. (*Id.* ¶ 25; Reyes Dep. [154] at 485.) Inmate Marshall King also declared

under oath that he experienced adverse health effects following exposure to secondhand K2 smoke. (King Decl. [154-1] at 124.)

Gevas alleged in the operative complaint, as he contends now, that the cell assignments violated the Eighth and First Amendments of the United States Constitution because Defendants Manzano and Rodriguez assigned him to cells with or near other prisoners who smoked K2 in retaliation for the grievances he filed. (Amended Compl. [8]; DSOF [125] ¶ 6.) Gevas also alleges that mail from his wife and Bible correspondences were deemed unauthorized in retaliation for the grievances. (Amended Compl. [8]; DSOF [125] ¶¶ 7, 63.) Based on the allegations in the operative complaint, the court allowed Gevas's claims under the Eighth and First Amendments to proceed. (Order [13].)

## ANALYSIS

Defendants have moved for summary judgment. They argue that the court should enter judgment in their favor for three reasons: (1) no reasonable jury could conclude that they deliberately subjected Gevas to unconstitutional conditions of confinement; (2) Gevas's cell assignments were not retaliatory; and (3) they are entitled to qualified immunity. (Def. Mem. [126] at 7–15; 15–17; 17–19.) The court addresses these arguments in turn.

## I.    Eighth Amendment Conditions of Confinement

The Eighth Amendment "requires that inmates be furnished with the basic human needs, one of which is reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (citation and internal quotation marks omitted). To defeat a motion for summary judgment on an Eighth Amendment conditions claim, a prisoner must come forward with evidence that: (1) the challenged condition was objectively serious, and (2) prison officials were "deliberately indifferent to this state of affairs." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (identifying objective and subjective components to Eighth Amendment

11

conditions claims).

### A.     Objectively Serious Condition

"Environmental tobacco smoke" may pose an unreasonable risk to a prisoner's present and future health.  *Helling*, 509 U.S. at 35.  Determining whether environmental tobacco smoke in a prison setting violates the Eighth Amendment "requires more than a scientific and statistical inquiry into the seriousness of the potential harm[.]"  *Id.* at 36.  "It [] requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."  *Id.* (emphasis in original).   For present purposes, the court sees little reason to distinguish between environmental tobacco smoke and environmental K2 smoke.  Thus, on the objective prong, Gevas must be able to show that the risk from exposure "is not one that today's society chooses to tolerate."  *Id.*

On this record, there is a disputed issue of fact on this question: whether exposure to secondhand K2 smoke at Dixon created an unreasonably safe condition.  Gevas has described the effects he experienced after exposure to secondhand K2 smoke.  He also presented accounts from two other people—a correctional officer and a fellow prisoner—who observed noticeable and significant side effects in persons who were exposed to K2 smoke.  (Dep. of Daniel Reyes, Ex. 22 to Plaintiff's LR 56.1(b)(3)(C) Stmt. [154 at 485] at 31:12-14; Decl. of Marshall King, Ex. 29 to Plaintiff's LR 56.1(b)(3)(C) Stmt. [154-1 at 124].)  From this evidence, a jury could conclude that exposure to the substance "violates contemporary standards of decency."

Defendants themselves acknowledge that exposure to secondhand smoke may support a conditions-of-confinement claim.  (Def.'s Mem. [126] at 9.)  Nevertheless, citing *Ball v. Beachem*, No. 22-2219, 2024 WL 3904617, at *6 (N.D. Ill. Aug. 22, 2024), they argue that Gevas must demonstrate that levels of secondhand smoke in *his cell* were unreasonably high and that

12

the smoke caused or is likely to cause him serious health problems. In *Ball*, a non-precedential ruling, the plaintiff produced scant evidence that he personally experienced a significantly adverse health effect from K2 exposure. Gevas, on the other hand, has presented evidence about the presence of secondhand K2 smoke in his housing units and his cells that, when coupled with his sleep apnea and need to use a CPAP machine, is enough to create a triable issue of fact as to whether he was exposed to unreasonably high levels of secondhand K2 smoke. *See, e.g., Hunt v. Reynolds*, 974 F.2d 734, 735–36 (6th Cir. 1992) ("the Eighth Amendment's objective component is violated by forcing a prisoner with a serious medical need for a smoke-free environment to share his cell with an inmate who smokes").

Again relying on *Ball*, Defendants also argue that Gevas did not produce evidence that he suffered a serious injury from exposure to secondhand K2 smoke or that his ailments can be linked to K2 smoke exposure. (Def.'s Mem. [126] at 10.) At summary judgment, however, a *pro se* plaintiff may rely on "the common-sense link" between an adverse prison condition and his asserted ailments. *Gray*, 826 F.3d at 1007. That is not to say Gevas should feel emboldened to abandon medical evidence of causation in the future. He does so at his own risk. But given his existing medical condition and the nature of the claims in this case—*i.e.*, that exposure to secondhand K2 smoke affected his ability to effectively use his CPAP machine and that the machine might have increased the amount of smoke that entered his lungs—Gevas's testimony is enough to survive summary judgment. *See id.* (explaining that lack of affidavit from medical expert on causal link between adverse cell conditions and prisoner's asthma did not necessarily doom prisoner's claim at summary judgment).

## B.     Defendants' State of Mind

The subjective component of a claim that prison conditions violated the Eighth Amendment requires the prisoner to "prove that prison officials acted with deliberate

indifference—that they knew of and disregarded this excessive risk of harm to the inmate." *Thomas v. Blackard*, 2 F.4th 716, 719–20 (7th Cir. 2021) (cleaned up). The official "must have been both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and he must [] have drawn the inference." *Gray*, 826 F.3d at 1008 (cleaned up). To make such a showing, plaintiff must establish that a defendant "must have known about the risk of physical or psychological harm resulting from the unsanitary conditions." *Id.* (citation and internal quotation marks omitted). This is so regardless of whether the risk to Gevas's health is characterized as stemming from an inhumane condition of confinement or from a failure to ensure that he could safely operate his prescribed medical device. *See Helling*, 509 U.S. at 32.

Defendant Manzano is entitled to summary judgment because Gevas produced no evidence from which a jury could reasonably conclude that Manzano was deliberately indifferent to Gevas's exposure to secondhand K2 smoke. Construed in Gevas's favor, the evidence suggests that Manzano was involved in Gevas's initial assignment to Unit 27. A note made by a third party in response to Gevas's April 9, 2023 grievance about his cell in Housing Unit 27 reads: "Emergency response on 04/11/2023 from Internal Affairs Lieutenant Manzano, 'the K2 smoke is being addressed in every unit. At this time, we will be moving Gevas to another cell in an attempt to assist him.'" (DSOF [125] ¶ 21 (citing Ex. 15 to DSOF [125-15] at 2).) But this single response attributed to Manzano does not suggest deliberate indifference given the lack of evidence Manzano knew the conditions in the new cell did not rectify the problem. *See Anderson*, 477 U.S. at 252 (explaining that mere scintilla of evidence is insufficient to defeat summary judgment). To the contrary, Manzano's prompt response and decision immediately to move Gevas shows he was not indifferent.

The evidence, construed in Gevas's favor, compels a different result for Defendant Rodriguez. Gevas's grievances about his cells were quite specific concerning the risks that

14

exposure to K2 smoke posed to him, and it appears that Rodriguez was responsible for Gevas's cell assignments. A jury could reasonably infer, from Gevas's assignment to cells with inmates who purportedly were known K2 smokers and from the decision to place Gevas on a wait list, that Rodriguez was deliberately indifferent to Gevas's need to safely use his CPAP machine. Rodriguez states that she did not know what K2 was prior to this lawsuit and that she was not aware of which prisoners consumed K2, which prisoners were under investigation related to K2, or which prisoners had been disciplined for possession or use of K2. But Gevas himself made repeated vocal and written complaints about K2 exposure. And, given evidence that K2 use was widespread, was a known problem, and was the reason for substantial enforcement efforts in the facility, a reasonable jury might question Ms. Rodriguez's assertion that the problem was news to her. *See Reinebold v. Bruce*, 18 F.4th 922, 927 (7th Cir. 2021) ("A district court judge may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts."). Whether Rodriguez knew of but disregarded the risks to Gevas's health when choosing his cell assignments is a question for the jury. *See, e.g., Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) ("Whether a prison official acted with the requisite state of mind is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." (citation and internal quotation marks omitted)). Rodriguez is not entitled to summary judgment on the Eighth Amendment conditions claim.

## II.     Eighth Amendment Failure to Protect

Gevas also presented evidence that Defendant Rodriguez did not take reasonable steps to prevent the encounter between him and his cellmate on September 23, 2023. Gevas characterizes the encounter as an assault and asserts a failure-to-protect claim against Rodriguez stemming from the events. (Pl. Opp'n [151] at 12–13.) Defendants ask the court to reject this claim on the ground that the court did not address it in the initial screening order; they assert that

it is too late to add an additional claim now. (Def.'s Reply [160] at 10–11.) But the facts on which the claim is based are identical to the facts supporting Gevas's Eighth Amendment conditions claim, and the relevant factual allegations appeared in Gevas's complaint. (*See* Amended Compl. [8] at 8–9.) Gevas seeks only to add a legal theory, not to change the factual basis of this lawsuit.

When a plaintiff seeks to add a new claim during summary judgment, the court must "consider whether it changes the complaint's factual theory, or just the legal theories plaintiff has pursued so far." *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017). When the plaintiff relies on new or different facts, the plaintiff may be attempting to amend his complaint. *Id.* If the facts remain the same, however, and the plaintiff only seeks to add a new legal theory, the court should consider whether allowing the new theory would cause unreasonable delay or make it more costly or difficult to defend the suit. *Id.* (citing *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996)).

Allowing Gevas to add a failure-to-protect theory against Rodriguez will not delay this matter, nor does the court discern any prejudice to Rodriguez. The claim relies on facts already in the record and is governed by the same legal standard as the conditions claim. *See Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (applying Eighth Amendment deliberate indifference standard to prisoner's failure-to-protect claim). The only difference is that a jury would be asked to determine whether Rodriguez was deliberately indifferent to the purported danger posed by Gevas's cellmate rather than the danger posed by secondhand K2 smoke. That said, the court notes that although Gevas contends the altercation was prompted by the cellmate's K2 use, the evidence suggests it was Gevas, not the cellmate, who initiated the fight. The failure-to-protect claim may therefore be difficult to prove, but the court will nevertheless allow it to proceed against Rodriguez.

As no evidence suggests that Defendant Manzano was involved in the September 2023

cell assignment, Manzano is entitled to summary judgment on the failure-to-protect claim as well.

### III.   First Amendment Retaliation

To survive a motion for summary judgment on a First Amendment retaliation claim, a prisoner must show "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert,* 557 F.3d 541, 546 (7th Cir. 2009) (citation and internal quotation marks omitted). The burden then shifts to the Defendant to rebut the *prima facie* claim by showing that he or she would have taken the same action regardless of the plaintiff's protected activity. *Kidwell v. Eisenhauer,* 679 F.3d 957, 964–65 (7th Cir 2012).

Gevas did not directly address the retaliation claim in response to Defendants' motion [151], but there is no reason to believe he abandoned the claim. Thus, Defendants are entitled to summary judgment only if they showed "that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

Filing grievances is protected First Amendment activity, and reassignment to a more restrictive or dangerous environment can be enough to deter protected activity, even if it did not actually deter the plaintiff. *Douglas v. Reeves*, 964 F.3d 643, 646–48 (7th Cir. 2020) ("The standard is objective, so a specific plaintiff's persistence does not undermine his claim."). Construing the evidence in Gevas's favor, at least four of his cell assignments (Unit 36, cell 22; Unit 29, cell 54; Unit 31, cell 5; Unit 31, cell 31) were significantly "worse" than the others because he was assigned to cells with "known K2 smokers." As a result, a jury could reasonably infer that the cell assignments were sufficiently deterrent. *See id.* at 647 ("whether retaliatory conduct is sufficiently severe to deter is generally a question of fact").

17

As to the third prong, a reasonable jury could conclude from the evidence that Gevas's grievances on the K2 issue were at least a motivating factor for the assignments. In particular, two assignments are more suggestive of retaliation than others: (1) Unit 31, cell 29 after Gevas declared a hunger strike to be removed from the cell; and (2) Unit 31, cell 31 where two purported K2 smokers resided. A jury could reasonably infer from these assignments that they were not wholly unrelated to Gevas's relentless grievance campaign.

The evidence here shows that Rodriguez was involved in cell assignments. The evidence that she was aware of Gevas's grievances is thin, but the record shows she did personally respond to at least one of Gevas's requests for a cell reassignment. (*See* DSOF [125] ¶ 34.) Specifically, on September 21, 2023, Gevas asked to be moved out of Housing Unit 36, cell 22 because his cellmate was a "known K2 smoker," the smoking affected Gevas's ability to use his CPAP machine, his cellmate "has delusional episodes," and Gevas "fear[ed] for [his] life." (Individual in Custody Request [125-13] at 2.) In her handwritten response to this request, Rodriguez stated: "I have placed you on the waiting list. There are no available low bunk cells at this time." (*Id.* at 1.) When asked about the notation during her deposition, Rodriguez testified: "I do not remember whether you had a low bunk permit[5] or not at this point." (Rodriguez Dep. [125-4] at 108:8–10.) Rodriguez's notation does nothing to rebut a presumption of retaliation.

Rodriguez also argues that she could not have intentionally housed Gevas with a known K2 smoker because she did not know which prisoners used or consumed K2. As previously discussed, though, a jury must decide whether to accept as true Rodriguez's assertions about her lack of knowledge. A reasonable jury could find that Rodriguez was unaware of or untroubled

---

[5] There is no evidence of a low-bunk permit in the record, nor other evidence of what factors influenced Gevas's housing assignments.

Gevas's grievances, but the court declines to grant summary judgment in her favor on the First Amendment retaliation claim.

Manzano, on the other hand, is again entitled to summary judgment because Gevas offers no evidence that Manzano was involved in assigning Gevas into cells with purportedly known K2 smokers. Nor has Gevas presented evidence that his mail was mishandled in retaliation for his filing of grievances about secondhand K2 smoke; indeed, there is no evidence that Defendants Manzano and Rodriguez were involved in handling Gevas's mail at all. Both Defendants Manzano and Rodriguez are entitled to summary judgment on Gevas's mail claim.

## IV.    Qualified Immunity

Qualified immunity protects public officials and employees "from liability for actions taken in the course of their official duties if their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether a public official or employee is entitled to qualified immunity, the court employs "a two-prong test: (1) whether the facts, viewed in a light most favorable to the injured party, demonstrate that the conduct of the officers violated a constitutional right, and (2) whether that right was clearly established at the time the conduct occurred." *Jackson v. Anastasio*, 150 F.4th 851, 856 (7th Cir. 2025) (citations omitted). "Unless both questions are answered in the affirmative, the defendant is protected by qualified immunity." *Villalobos v. Picicco*, 168 F.4th 1057, 1062 (7th Cir. 2026).

As to the first prong, the court asks whether the plaintiff has shown "a violation of a constitutional right—or to be more precise, whether he has offered evidence that would allow a reasonable jury to find that he suffered a violation of a constitutional right." *Jackson*, 150 F.4th at 857. A reasonable jury may well conclude otherwise, but Gevas has offered evidence from which

19

a jury could find that Defendant Rodriguez violated the Eighth Amendment when she assigned Gevas to a series of cells that exposed him to K2 smoke that, Gevas says, prevented him from safely using his CPAP machine.

As the court has granted Manzano summary judgment on the merits of Gevas's claims, the court considers the second prong of the qualified immunity analysis only with respect to Rodriguez. When a defendant properly raises a qualified immunity defense, the burden shifts to the plaintiff to defeat it. *Villalobos*, 168 F.4th at 1062–63. Defendants raised the qualified immunity defense in their opening brief under the heading, "Defendants are entitled to Qualified Immunity on Plaintiff's Conditions of Confinement Claim and His Retaliation Claim." (Def. Mem. [126] at 17.) Although the heading so reads, the argument in the text makes no mention of Gevas's retaliation claim. (*Id.* at 17–19.) Rodriguez thus appears to have forfeited any argument that she is entitled to qualified immunity on the retaliation claim. *See Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) ("Seventh Circuit precedent is clear that perfunctory and undeveloped arguments . . . are waived." (citation and internal quotation marks omitted)).

Nor is it clear to the court that Defendants "properly raised" qualified immunity on the Eighth Amendment conditions claim. In their memorandum, rather than defining the right for which Rodriguez seeks immunity or identifying the undisputed facts on which Gevas's claim rests, Defendants merely set out the black letter law of qualified immunity and abruptly assert: "There is no clear constitutional precedent resolving this issue." (Def. Mem. [126] at 18.) The next (rather confusing) sentence states: "Any failure to keep K2 out of Dixon Correctional Center, or to preclude the possession or use of K2, was not a failure by the Defendants; nor by a failure of Dixon [] to develop and implement mitigation efforts, but rather due to the nature of the contraband itself." *Id.* (*See also* Def. Reply [160] at 11–12.) Defendants then assert that "the most common introduction of K2 into Dixon . . . is through the use of the mails" and that they "had to weigh

20

benefits and harms of taking further action to combat the flow of illicit drugs into Dixon[.]" (Def. Reply [126] at 18–19.) The court is uncertain what harm would result from taking action to combat the flow of drugs into the facility, but does not doubt that abuse of drugs by prisoners poses difficult challenges for prison officials. Nonetheless, their qualified immunity argument misses the mark.

To survive a qualified immunity challenge, Gevas was required to identify "'a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand.'" *Villalobos*, 168 F.4th at 1063 (quoting *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019)). He was not required to identify an identical case. *Id.* He need only "'point to precedent placing the statutory or constitutional question beyond debate'" and defining the rule in a way that would be "'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Schimandle v. Dekalb Cnty. Sheriff's Off.*, 114 F.4th 648, 655 (7th Cir. 2024), and *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021)).

Gevas identified *Helling v. McKinney*, 509 U.S. 25 (1983), as authority for the right that, he claims, Rodriguez violated. In *Helling*, a prisoner claimed that his involuntary exposure to environmental tobacco smoke from his cellmate's and other prisoners' cigarettes posed an unreasonable risk to his health in violation of the Eighth Amendment. Plaintiff shared a cell with a prisoner who smoked as many as five packs of cigarettes a day, allegedly causing plaintiff to suffer health problems resulting from exposure to smoke. In finding that exposure to environmental tobacco smoke could violate the Eighth Amendment, the Supreme Court discussed well-established precedent holding that prison officials violate the Eighth Amendment when they are deliberately indifferent to a prisoner's serious medical needs. The Supreme Court also expressed: "We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that

21

is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Id.* at 33.

K2 smoke is not cigarette smoke—but if Gevas is to be believed, the conditions caused by exposure to secondhand K2 smoke are similar enough to the conditions considered by the Supreme Court in *Helling* to put Rodriguez on notice that assigning Gevas to a cell with a prisoner who smoked could violate the Eighth Amendment. There is room for fact development at trial that might allow Rodriguez to distinguish the claim against her from *Helling*, but on this record, Gevas's cell assignments appear to result in such significant exposure to secondhand smoke as to pose an unreasonable risk of serious damage to a prisoner's health. Consequently, Rodriguez is not entitled to qualified immunity on the present record. The motion for summary judgment on the basis of qualified immunity is denied.

## CONCLUSION

Defendants' motion for summary judgment [124] is granted with respect to Defendant Manzano on all claims, and for both Defendants on the mishandling-of-mail claim. The motion is otherwise denied. The case will proceed against Defendant Rodriguez on claims of violation of the Eighth and First Amendments.

ENTER:

Dated: April 15, 2026

REBECCA R. PALLMEYER
United States District Judge

22